## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

AMERICAN FREE ENTERPRISE CHAMBER
OF COMMERCE; and
MICHIGAN OIL AND GAS ASSOCIATION,

*Plaintiffs*,

v.                                                  Case No. 1:25-cv-67

JANE NISHIDA, in her official capacity as the
Acting Administrator of the United States En-
vironmental Protection Agency; UNITED
STATES ENVIRONMENTAL PROTECTION
AGENCY; and UNITED STATES OF
AMERICA,

*Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The above-captioned Plaintiffs, by and through their undersigned attorneys, allege as follows:

## INTRODUCTION

1.     As part of the enormous package deal that was the 2022 so-called Inflation Reduction Act ("IRA"), Congress added Section 136 to the Clean Air Act ("CAA"), *see* Pub. L. No. 117-169, § 60113, 136 Stat. 1818, 2073, *codified at* 42 U.S.C. § 7436, to impose a tax on methane emitted from certain petroleum and natural gas facilities. It labeled this tax the "Waste Emissions Charge" ("Methane Tax").

2.     Section 136 was not enacted through the ordinary legislative process. It did not receive dedicated hearings, nor was it subject to debate and revision. Rather, it was enacted as part of a massive take-it-or-leave-it package negotiated behind closed doors.

1

This lack of deliberation is apparent in the enacted text, which gives the U.S. Environmental Protection Agency ("EPA") an impossible task: determine who is subject to the tax by comparing purported emissions reductions in proffered state plans to reductions that would have hypothetically been achieved under a 2021 proposal that—apparently unbeknownst to Congress—*contained no regulatory text.*

3.      Section 136, however, is clear about one thing: the tax must be "imposed and collected" for emissions that occur during "calendar year 2024 and for each year thereafter." 42 U.S.C. § 7436(g).

4.      Section 136 is unconstitutional. The decision of whom and what to tax is *the* archetypal legislative decision, which the Constitution requires Congress to make. But Section 136's unintelligible text leaves that decision to EPA in practice, thus violating Article I. For similar reasons, Section 136 violates the constitutional non-delegation doctrine, leaving EPA without the requisite "intelligible principle" to guide its determination of Methane Tax liability. Moreover, to the extent that the Tax applies to export facilities, Section 136 violates the Constitution's Export Clause. This Court should declare that Section 136 is unconstitutional and enjoin EPA from enforcing it.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 2201, and 5 U.S.C. § 702. *See United States v. City of Detroit*, 329 F.3d 515, 520–21 (6th Cir. 2003) (en banc).

6.      Venue is proper in this district under 28 U.S.C. § 1391(e)(1)(C) because an agency of the United States and the United States are Defendants and Plaintiff Michigan Oil and Gas Association resides in this district.

## PARTIES

### I.    Plaintiffs

7.    Plaintiff American Free Enterprise Chamber of Commerce ("AmFree") is a 501(c)(6) membership organization founded in 2022 that represents entrepreneurs and businesses across all sectors. AmFree's members are vitally interested in the preservation of free markets, free innovation, and the continued vitality of United States petroleum and natural gas production, along with the economic growth and opportunities it enables. AmFree's members include owners and operators of petroleum and natural gas production, processing, storage, and transport facilities that are affected by Section 136 and will suffer economic harm from Methane Tax liability under Section 136.

8.    Plaintiff Michigan Oil and Gas Association ("MOGA") is a non-profit membership organization incorporated in Michigan with its headquarters in Lansing. MOGA represents exploration, drilling, production, transportation, processing and storage of crude oil and natural gas interests in the State. MOGA has nearly 650 members including independent oil companies, major oil companies, the exploration arms of various utility companies, diverse service companies and individuals, many of whom are affected by Section 136 and will suffer economic harm from Methane Tax liability under Section 136.

### II.    Defendants

9.    Defendant United States Environmental Protection Agency is the federal agency tasked by Congress with implementing Section 136.

10.    Defendant Jane Nishida is the Acting Administrator of EPA. Nishida is sued in her official capacity.

11.    Defendant United States of America is the federal government of the United States of America.

3

## STATEMENT OF FACTS

### I.    The Clean Air Act's Pre-Existing Methane Emissions Program

12.    Over the last decade, EPA has leveraged various sections of the Clean Air Act to regulate certain industrial methane emissions.

### *Section 114 and Subpart W*

13.    Section 114 of the CAA empowers EPA to impose various monitoring and reporting requirements on owners, operators, and manufacturers of emissions sources for certain pollutants. *See* 42 U.S.C. § 7414. Since 2009, EPA has applied this authority to require reporting of greenhouse gas emissions, including methane. *Mandatory Reporting of Greenhouse Gases*, 74 Fed. Reg. 56,260 (Oct. 30, 2009); *see* 40 C.F.R. pt. 98. Methane is an odorless, combustible gas that is the primary component of natural gas.

14.    In 2010, EPA added Subpart W, which specifies the reporting requirements for owners and operators of petroleum and natural gas production and distribution systems. *Mandatory Reporting of Greenhouse Gases: Petroleum and Natural Gas Systems*, 75 Fed. Reg. 74,458 (Nov. 30, 2010), *codified as amended at* 40 C.F.R. pt. 98, subpt. W (40 C.F.R. §§ 98.230–98.238). Methane can be emitted during production and transportation of oil and natural gas intentionally (through venting and flaring for emergency and safety purposes) or unintentionally (through leaks or during routine or maintenance operations).

15.    Under Subpart W, facilities in the natural gas and petroleum supply chains must report greenhouse gas emissions if they emit 25,000 metric tons or more of carbon-dioxide-equivalent emissions each year. 40 C.F.R. § 98.231(a). For gases other than carbon dioxide, "equivalent" emissions are determined by multiplying emissions by the gas's "global warming potential" ("GWP"), a value that purportedly measures "how much

energy the emission of 1 ton of a gas will absorb over a given period of time, relative to the emission of 1 ton of carbon dioxide." EPA, *Understanding Global Warming Potentials*, https://www.epa.gov/ghgemissions/understanding-global-warming-potentials (last updated Jan. 8, 2025). EPA specifies the GWP used for regulatory purposes in 40 C.F.R. pt. 98, subpt. A, tbl. A-1. Since 2014, EPA has deemed methane to have a GWP of 25, so that 1,000 metric tons of methane emissions trigger the Subpart W reporting requirement (1,000 x 25 = 25,000). *See* 40 C.F.R. pt. 98, subpt. A, tbl. A-1 (2024); 78 Fed. Reg. 71,904, 71,948 (Nov. 29, 2013). In April 2024, EPA increased methane's regulatory GWP to 28 effective January 1, 2025, so that starting in calendar year 2025, only approximately 893 tons of methane emissions will trigger Subpart W's reporting obligation (893 x 28 = 25,004). *See* 40 C.F.R. pt. 98, subpt. A, tbl. A-1; 89 Fed. Reg. 31,802 31,812 (Apr. 25, 2024).

16.     Traditionally, under Subpart W, EPA has required petroleum and natural gas facilities to calculate their greenhouse gas emissions for reporting purposes using equations specified by EPA rather than by measuring actual emissions. 40 C.F.R. § 98.233 (2023); *see also, e.g.*, 40 C.F.R. § 98.233(a)(3)(i)(B), (c)(3)(i) (2025). These equations include EPA-specified "emissions factors" that estimate the amount of gas EPA expects would be emitted from generic components and equipment—such as device vents, pumps, wellheads, etc.—over a given time period. *See* 40 C.F.R. pt. 98, subpt. W, tbl. W-1A (2023) (specifying gas emission in standard cubic feet ("scf") per hour per unit of equipment); *see also* 40 C.F.R. pt. 98, subpt. W, tbl. W-1 (2025) (same). A facility's total emissions are then effectively calculated by counting the number of each type of component or equipment and summing the emissions expected from the generic form of that component or equipment under the facility's operating conditions. 40 C.F.R. § 98.233 (2023); *see also,*

*e.g.*, 40 C.F.R. § 98.233(a)(3)(i)(B), (c)(3)(i) (2025). For example, a facility using natural gas driven pneumatic pumps had to calculate annual emissions from venting those pumps by multiplying the number of those pumps in the facility by the specified emission factor for such pumps, the concentration of methane in the natural gas, and the average estimated number of hours the pumps were operational during the year. 40 C.F.R. § 98.233(c) (2023); 40 C.F.R. § 98.233(c)(3)(i) (2025).

### Section 111 and the 2021 Methane Proposal

17.    Section 111 of the CAA provides for regulating emissions of certain pollutants from "stationary source[s]," which include any "building, structure, facility, or installation which emits or may emit any air pollutant." 42 U.S.C. § 7411(a)(3). Under this provision, EPA is required to maintain "a list of categories of stationary sources" that "cause[], or contribute[] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." *Id.* § 7411(b)(1)(A).

18.    Section 111(b) then directs EPA to set performance standards for "new sources" on the list, while Section 111(d) directs States to establish a plan that sets performance standards for "existing sources." *Id.* § 7411(b), (d); *see id.* § 7411(a)(2), (6) (defining "new source" and "existing source"). States must submit their plans to EPA for approval, but Section 111(d) gives States considerable flexibility to determine appropriate standards, allowing States "to take into consideration, among other factors, the remaining useful life of the existing source to which such standard applies." *Id.* § 7411(d)(1).

19.    EPA first listed oil and natural gas production as a source "category" in 1979. *Priority List and Additions to the List of Categories of Stationary Sources*, 44 Fed. Reg. 49,222, 49,226 (Aug. 21, 1979). The category is capacious. For oil, it includes oil wells and transport up to the refinery; for natural gas, it includes facilities involved in producing,

gathering, processing, storing, and transmitting gas, up to the city-gate where gas is transferred to the local distribution network. *Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review*, 89 Fed. Reg. 16,820, 16,842 n.90 (Mar. 8, 2024).

20.    EPA first promulgated federal standards for methane emissions from new sources in 2016. *See Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources*, 81 Fed. Reg. 35,824, 35,841–44 (June 3, 2016), *codified at* 40 C.F.R. pt. 60, subpt. OOOOa.

21.    In 2020, EPA rescinded most of the regulations as they applied to methane from oil and natural gas sources. *Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources Review*, 85 Fed. Reg. 57,018 (Sept. 14, 2020).

22.    The repeal was short-lived. The 2020 rescission was the subject of a 2021 CRA resolution of disapproval. Pub. L. No. 117-23, 135 Stat. 295 (June 30, 2021). The resolution passed both houses and was signed into law, meaning the rescission had "no force or effect" and the 2016 regulations were again operative. 5 U.S.C. § 802(a).

23.    In November 2021 EPA published what it called a "Proposed Rule" that proposed a new and aggressive approach to limit methane emissions from new sources in the oil and natural gas sector. *Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review*, 86 Fed. Reg. 63,110, 63,114 (Nov. 15, 2021) ("2021 Methane Proposal"). For example, EPA proposed that new or modified gas-driven pneumatic controllers should generally "emit *zero* methane and VOC," based on electric pumps using solar panels or grid electricity. *Id.* at 63,202, 63,205 (emphasis added).

24.     The 2021 Methane Proposal also proposed, for the first time, *federal* "emissions guidelines" for *state* regulation of existing sources. *Id.* at 63,110, 63,114.

25.     The 2021 Methane Proposal, however, included no proposed regulatory text. Instead, EPA announced plans "to issue a supplemental proposal … to provide regulatory text for the proposed" standards and guidelines. *Id.* at 63,115.

26.     I n December 2022, EPA published a "[s]upplemental notice of proposed rulemaking." *Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review*, 87 Fed. Reg. 74,702 (Dec. 6, 2022) ("2022 Methane Proposed Rule"). This second publication responded to some of the comments received related to the 2021 Methane Proposal and included proposed regulations. *See* EPA-HQ-OAR-2021-0317-1551 (proposed Subpart OOOOb, new source standards); EPA-HQ-OAR-2021-0317-1552 (proposed Subpart OOOOc, existing source guidelines).

## II.    Congress Adds Section 136 to Impose a Methane Tax

27.     Before EPA published the 2022 Methane Proposed Rule, Congress added Section 136 to the CAA in the IRA. Pub. L. 117-169, § 60113, 136 Stat. at 2073, *codified at* 42 U.S.C. § 7436. Section 136 assesses a "Waste Emissions Charge"—a tax—on certain "excess" methane emissions from specific segments of the oil and gas sector (the Methane Tax).

28.     Under Section 136, "an owner or operator of an applicable facility that reports more than 25,000 metric tons of carbon dioxide equivalent of greenhouse gases emitted per year" under Subpart W is assessed "a charge on methane emissions that exceed an applicable waste emissions threshold." 42 U.S.C. § 7436(c).

29.    An "[a]pplicable facility" is any facility involved in the production, gathering, or boosting of petroleum or natural gas or the processing, compression, storage, or transmission of natural gas, across nine specified "industry segments." *Id.* § 7436(d). It includes all "[l]iquefied natural gas import and export equipment." *Id.* § 7436(d)(7).

30.    The "applicable waste emissions threshold" is the amount of methane a facility may emit without incurring Methane Tax liability. Generally, it is calculated as a small fraction of one percent of the natural gas sent to sale from or through the facility, where the fraction depends on the industry segment: 0.20 percent for on- or off-shore production facilities, *id.* § 7436(f)(1)(A); 0.05 percent for nonproduction facilities, including onshore gas processing, liquefied gas storage, liquefied gas import/export, and onshore petroleum and gas gathering and boosting facilities, *id.* § 7436(f)(2); and 0.11 percent for transmission facilities, including onshore gas transmission compression, underground gas storage, and onshore transmission pipeline facilities, *id.* § 7436(f)(3). For oil-producing facilities that send no natural gas to sale, the applicable waste emissions threshold is 10 metric tons of methane per million barrels of oil sent to sale. *Id.* § 7436(f)(1)(B).

31.    Calculating a facility's Methane Tax liability requires two steps. First, the facility's excess methane emissions are calculated as the amount by which the facility's methane emissions reported under Subpart W exceed the facility's applicable waste emissions threshold. *Id.* § 7436(e)(1). Second, the number of metric tons of excess emissions is multiplied by a statutorily specified charge amount, which varies by year. The charge amount starts at $900 per metric ton for calendar year 2024 emissions, increases to $1,200 per metric ton for calendar year 2025 emissions, and then levels off at $1,500 per metric ton for emissions in calendar years 2026 and beyond. *Id.* § 7436(e)(2).

32.    Section 136 requires the Methane Tax to be "imposed and collected" for emissions reported for "calendar year 2024 and for each year thereafter." *Id.* § 7436(g).

33.    Critically, Section 136 also requires "calculation of charges" be "based on empirical data" that "accurately reflect the total methane emissions … from the applicable facilities." *Id.* § 7436(h). EPA must "allow owners and operators of applicable facilities to submit empirical emissions data, in a manner to be prescribed by the [EPA] Administrator, to demonstrate the extent to which a charge under subsection (c) [the Methane Tax] is owed." *Id.*

34.    EPA's traditional approach to greenhouse gas reporting, however, is based on calculated—not empirical, or measured—emissions. Accordingly, Section 136 directs EPA to "revise the requirements of subpart W … to ensure the reporting under [that] subpart, and calculation of [the Methane Tax] are based on empirical data." *Id.*

## III.    Congress Attempts to Incentivize State Oversight, Limit the Reach of the Methane Tax, and Reward Good Faith Compliance

35.    At the same time, Congress wanted to limit the reach of its new Methane Tax. Section 136 thus provides various flexibilities and exemptions, which are integral to the statutory design. Among other purposes, the flexibilities and exemptions incentivize state regulatory oversight and facility compliance, reward good faith compliance efforts, and ensure facility owners and operators are not penalized for events outside their control. Together, these flexibilities and exemptions aim to make the Methane Tax a targeted assessment on facilities that are actually generating "waste" emissions, and not a blanket charge on all industry participants.

36.    First, "facilities under common ownership or control" are allowed to "net[] … emissions by reducing the total obligation to account for facility emissions levels that

10

are below the applicable thresholds within and across all" commonly owned or controlled facilities. 42 U.S.C. § 7436(f)(4). In other words, "netting" allows facilities with emissions below the waste emissions threshold to offset emissions from facilities above the threshold to reduce the overall Methane Tax burden on their common owner or operator.

37.    Second, the Methane Tax does not assess a charge for above-threshold emissions "caused by unreasonable delay, as determined by the [EPA] Administrator, in environmental permitting of gathering or transmission infrastructure necessary for offtake of increased volume as a result of methane emissions mitigation implementation." *Id.* § 7436(f)(5).

38.    Third, the Methane Tax is not imposed on emissions from plugged wells that were "permanently shut-in and plugged in the previous year in accordance with all applicable [federal] closure requirements." *Id.* § 7436(f)(7).

39.    Fourth, and most importantly, Section 136 exempts from the Methane Tax facilities that are "in compliance with [federal and state] methane emissions requirements" promulgated under Sections 111(b) and (d). *Id.* § 7436(f)(6)(A).

40.    Facilities may qualify for this "regulatory compliance" exemption only if EPA determines that "(i) methane emissions standards and plans pursuant to [Sections 111(b) and (d)] have been approved and are in effect in all States with respect to the applicable facilities" and "(ii) compliance with the requirements described in clause (i) *will result in equivalent or greater emissions reductions as would be achieved by [EPA's 2021 Methane Proposal], if such rule had been finalized and implemented.*" *Id.* § 7436(f)(6)(A)(i)–(ii) (emphasis added) (the "equivalency determination").

41.    In theory, the regulatory compliance exemption incentivizes states to put in place plans with appropriate methane emissions standards for existing sources and

encourages facility owners and operators to remain in compliance with those plans (and federal new source standards) to avoid Methane Tax liability.

42.    But the regulatory compliance exemption's equivalency determination, as drafted by Congress, is incomprehensible. It is like asking if an "only child" is taller than his siblings—one side of the comparison is a nullity. The 2021 Methane Proposal *did not include* proposed regulatory text that could be finalized or implemented. *See* 86 Fed. Reg. at 63,115. Section 136's equivalency determination requirement thus commands EPA to perform an impossible task—comparing purported emissions reductions under a particular state plan with hypothetical reductions achieved by nonexistent regulatory text.

43.    Although the equivalency determination is incomprehensible, it appears that Congress intended the regulatory compliance exemption to apply widely, so that the Methane Tax would apply only to those facility owners and operators who did not make best efforts to comply with these other regulatory obligations.

## IV.    EPA, At Last, Promulgates a Rule to Implement the Methane Tax and Finalizes a Methane Rule

44.    EPA's rollout of Section 136's Methane Tax program has been profoundly jumbled. Although the Methane Tax applies to emissions beginning January 1, 2024, and charges must be "based on empirical data," 42 U.S.C. § 7436(g)–(h), EPA did not finalize revisions to the Subpart W reporting requirements providing for submission of empirical data until May 2024, well into the first year of the Tax. *See Greenhouse Gas Reporting Rule: Revisions and Confidentiality Determinations for Petroleum and Natural Gas Systems*, 89 Fed. Reg. 42,062 (May 14, 2024).

45.    EPA also waited until January 2024 to publish a proposed rule to implement the Methane Tax, itself. *Waste Emissions Charge for Petroleum and Natural Gas Systems*, 89 Fed. Reg. 5,318 (Jan. 26, 2024) ("Proposed Methane Tax Rule").

46.    By that time, EPA had also not finalized or implemented *any* new methane standards or guidelines. Indeed, EPA did not finalize new methane standards or guidelines until March 2024. 89 Fed. Reg. 16,820. Legal challenges to that rule are already pending in the D.C. Circuit Court of Appeals. *See Texas v. EPA*, No. 24-1054 (D.C. Cir. filed Mar. 8, 2024); *Oklahoma v. EPA*, No. 24-1059 (D.C. Cir. filed Mar. 12, 2024).[1]

47.    EPA finalized the Methane Tax Rule on November 18, 2024, more than ninety percent of the way through the first year that the tax applies. *Waste Emissions Charge for Petroleum and Natural Gas Systems: Procedures for Facilitating Compliance, Including Netting and Exemptions*, 89 Fed. Reg. 91,096 (Nov. 18, 2024) ("Methane Tax Rule"). The first Methane Tax payment—for calendar year 2024 emissions—is due September 2, 2025. *Id.* at 91,144 & n.67, 91,167–68.

48.    EPA intends to collect the Methane Tax, even though Congress made it impossible for EPA—or anyone else—to determine to whom the Tax applies, and even though EPA's delay in promulgating the final Subpart W reporting requirements and Methane Tax Rule until well into calendar year 2024 makes it nearly impossible for the "calculation of charges" for 2024 calendar year emissions to be "based on empirical data" that "accurately reflect[s] the total methane emissions … from the applicable facilities." 42 U.S.C. § 7436(h).

---

[1] MOGA is a Plaintiff in *Mich. Oil & Gas Ass'n v. EPA*, No. 24-1101 (D.C. Cir. filed Apr. 29, 2024), which is consolidated under *Texas v. EPA*, No. 24-1054.

## CLAIMS FOR RELIEF

## COUNT ONE

### Violation of Article I, § 1 of the United States Constitution
### (Unintelligibility Canon)

49.    Plaintiffs reallege paragraphs 1 through 48 as if fully stated herein.

50.    Article I of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States" and nowhere else. U.S. Const. art. I, § 1. The Constitution "permits no delegation of those powers." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).

51.    So, "when Congress confers decisionmaking authority upon agencies *Congress* must 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'" *Id.* (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)) (emphasis original).

52.    This constitutional truism animates not only non-delegation principles, *see* Count Two, *infra*, but also the unintelligibility canon, which provides that "[a]n unintelligible text is inoperative." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 134 (2012). An agency may not promulgate or enforce a rule based on statutory text that is unintelligible because "[t]o give meaning to what is meaningless is to create a text rather than interpret one." *Id.* And only Congress may create legislative text. *See also A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529–42 (1935); *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 414–30 (1935).

53.    In Section 136, Congress gives EPA an impossible task in making the equivalency determination for the regulatory compliance exemption: determining whether "compliance with the requirements [of approved methane emissions standards and

plans] will result in equivalent or greater emissions reductions as would be achieved by [the 2021 Methane Proposal]"—a proposal so lacking in specificity that it contained no proposed regulatory text—"if [it] had been finalized and implemented." 42 U.S.C. § 7436(f)(6)(A)(i)–(ii).

54.    EPA cannot compare the emissions reductions achieved by any state plan to an emissions baseline based on a hypothetical "finalized and implemented rule" derived from a proposal that, itself, *lacked any regulatory text*. "There is no there there," Gertrude Stein, *Everbody's Autobiography* (1937), since there is no "rule" that could be finalized. EPA, itself, recognized this conundrum in its Proposed Methane Tax Rule, confessing that "because state plans were never developed pursuant to the [2021 Methane Proposal], *there is no means of reasonably estimating* the requirements that may have been included in those state plans and what emissions reductions they would have achieved." 89 Fed. Reg. at 5342 (emphasis added).

55.    EPA also has elsewhere acknowledged that "the statutory language in [Clean Air Act] section 136(f)(6)(A)(ii) does not indicate how the EPA should conduct th[e] equivalency evaluation" or make the comparison. 2022 Methane Proposed Rule, 87 Fed. Reg. at 74,721. EPA, however, incorrectly characterized the provision as "ambigu[ous]." *Id*. An ambiguous text is one that "literally read, admits of two plausible interpretations." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 419 n.2 (2005). Section 136(f)(6)(A) is not susceptible of *any* plausible interpretation.

56.    In contract law, this would be called "a mistake of fact" on Congress's part. *See, e.g.*, Restatement (Second) of Contracts § 151 (Am. L. Inst. 1981). Congress's instruction in Section 136(f)(6)(A)(i)–(ii) is meaningless because it rests on the incorrect premise that the 2021 Methane Proposal was complete enough to serve as a comparator, that

is, that EPA can determine how much emissions reduction state plans under the 2021 Methane Proposal would have achieved. That mistake of fact makes it impossible for EPA—or anyone else—to determine whether a facility is subject to the Methane Tax or exempt through compliance with applicable federal and state regulations. As in contract law, because Congress's mistake relates to a basic assumption that has a material effect on performance under the statute, the appropriate remedy is invalidation. *Cf. id.* § 152.

57.    Despite the impossibility of determining who is subject to the Tax, EPA has promulgated a rule that assigns liability for 2024 and implements this charge. Methane Tax Rule, 89 Fed. Reg. 91,094. EPA requires parties to pay the Methane Tax for calendar year 2024 emissions by September 2, 2025, or face daily increasing "financial sanctions." *Id.* at 91,144, 91,147. Owners and operators of facilities covered by Section 136, including members of MOGA and AmFree, are thus subject to Methane Tax liability even though Congress included a regulatory compliance exemption that may well exempt those facilities—if that exemption were comprehensible.

58.    Because Section 136(f)(6)'s regulatory compliance exemption is unintelligible, enforcement by EPA would violate Article I, § 1 of the United States Constitution.

59.    Section 136(f)(6)'s regulatory compliance exemption is not severable, and so Section 136 is, in its entirety, unconstitutional and unenforceable. "The inquiry into whether a statute is severable is essentially an inquiry into legislative intent." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999). A provision is not severable if excising it would give the statute "an effect altogether different from that sought by the measure viewed as a whole." *N.J. Thoroughbred Horsemen's Ass'n v. NCAA*, 584 U.S. 453, 481–82 (2018).

60.     Without the regulatory compliance exemption, the Methane Tax is a wholly different program, with different incentives and different reach, than the one Congress intended. The regulatory compliance exemption implements Congress's intent to incentivize states to adopt rigorous methane standards for existing sources. It also is intended to encourage facility owners to quickly comply. But without the exemption, those incentives are entirely absent. Moreover, removing the compliance exemption vastly expands the Tax's scope, transforming it from a targeted assessment on some of the industry's worst performers to a blanket charge on a much wider range of industry participants.

## <u>COUNT TWO</u>

### Violation of Article I, § 1 of the United States Constitution (Nondelegation Principle)

61.     Plaintiffs reallege paragraphs 1 through 60 as if fully stated herein.

62.     Article I of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States" and nowhere else. U.S. Const. art. I, § 1. Thus the Supreme Court has long held that Congress may not "delegate … powers which are strictly and exclusively legislative." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825); *see also Schechter Poultry Corp.*, 295 U.S. at 529–42; *Panama Refin. Co.*, 293 U.S. at 414–30.

63.     The contours of the test for nondelegation have "evolv[ed]" over the years. *Gundy v. United States*, 588 U.S. 128, 162 (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.). Although widely criticized, the modern test asks "whether Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Id.* at 135 (majority opinion). That is, Congress must "provide[] an administrative agency with standards guiding its actions such that a court could ascertain whether the will of

Congress has been obeyed." *Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212, 218 (1989) (cleaned up).

64.    As explained in Count One, Section 136(f)'s regulatory compliance exemption—which defines the reach of the Methane Tax—is incomprehensible and so fails even the lenient "intelligible principle" test. The task that Congress gives EPA in Section 136(f)(6)(A) is an *impossible* one: determining whether "compliance with the requirements [of approved methane emissions standards and plans] will result in equivalent or greater emissions reductions as would be achieved by [the 2021 Methane Proposal]"—a proposal so lacking in specificity that it contained no proposed regulatory text—"if [it] had been finalized and implemented." 42 U.S.C. § 7436(f)(6)(A)(i)–(ii). Because the task is impossible, no "court could ascertain" whether any implementation of Section 136(f)(6)(A) coheres with "the will of Congress." *Skinner*, 490 U.S. at 218 (cleaned up). Any attempt by EPA to give meaning to this meaningless text is thus necessarily *making*, rather than *administering*, the law. *See* Scalia & Garner, *supra*, at 134.

65.    Section 136 also violates the original understanding of nondelegation. The original understanding prohibited any transfer of Congress's vested legislative powers to any other entity. *See Gundy*, 588 U.S. at 155–58 (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.). This means that Congress must "make[] the policy decisions when regulating private conduct," but Congress can still "authorize another branch to 'fill up the details'" or "make the application of that rule depend on executive fact-finding." *Id.* at 157–58.

66.    The legislative power includes the power "[t]o lay and collect Taxes, Duties, Imposts, and Excises." U.S. Const. art. I, § 8, cl. 1. Section 136's "Waste Emissions Charge" is a tax, at least because "some of the … costs paid by the regulated parties actually inure

to the benefit of the public rather than directly to the benefit of those" who pay it. *Skinner*, 490 U.S. at 223; *see also Nat'l Cable Television Ass'n*, 415 U.S. at 340–41 (distinguishing taxes and fees).

67.    Determining *whom* to tax is a major policy decision, and so is "quintessentially legislative" and reserved to Congress. *Consumers' Rsch. v. FCC*, 109 F.4th 743, 758 (5th Cir. 2024) (en banc); *see also Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340 (1974) ("Taxation is a legislative function, and Congress … is the sole organ for levying taxes.").

68.    Because Section 136(f)(6)(A)'s equivalency determination is incomprehensible, Congress has failed to adequately specify who is subject to the Methane Tax. Any attempt by EPA to implement the regulatory compliance exemption thus necessarily represents the agency's *own* determination of who should pay. That goes far beyond merely "fill[ing] up the details" and is an impermissible agency exercise of legislative power. *Gundy*, 588 U.S. at 157 (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.) (cleaned up).

69.    Nor can EPA "cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute." *Am. Trucking Ass'ns*, 531 U.S. at 472. The limiting guidance must be embodied in the law, itself, not in an agency's implementation of the law. Accordingly, no rule implementing Section 136(f)(6)(A) can save Congress's incomprehensible equivalency determination.

70.    Therefore, under either the modern "intelligible principle" test or the original understanding of nondelegation, Section 136(f)(6) delegates legislative power to EPA in violation of Article I, § 1 of the United States Constitution.

71.    As explained in Count One, Section 136(f)(6)'s regulatory compliance exemption is not severable. EPA cannot administer the Methane Tax without making this determination because Section 136 specifies that facilities that meet the regulatory compliance exemption are not subject to the Tax. Section 136 is therefore unconstitutional and unenforceable in its entirety.

### COUNT THREE

### Violation of the Export Clause, Article I, § 9, Cl. 5 of the United States Constitution

72.    Plaintiffs reallege paragraphs 1 through 71 as if fully stated herein.

73.    Article I of the Constitution also commands that "[n]o Tax or Duty shall be laid on Articles exported from any State." U.S. Const. art. I, § 9, cl. 5.

74.    This Clause "broadly exempt[s] from federal taxation not only export goods, but also services and activities closely related to the export process." *United States v. Int'l Bus. Machs. Corp.* ("*IBM*"), 517 U.S. 843, 846 (1996).

75.    Just as its text indicates, the Clause "strictly prohibits any tax or duty, discriminatory or not, that falls on exports during the course of exportation." *Id.* at 848 (citations omitted).

76.    As explained in Count Two, Section 136's "Waste Emissions Charge" is a tax, at least because "some of the … costs paid by the regulated parties actually inure to the benefit of the public rather than directly to the benefit of those" who pay it. *Skinner*, 490 U.S. at 223; *see also Nat'l Cable Television Ass'n*, 415 U.S. at 340–41 (distinguishing taxes and fees).

77.    The Methane Tax applies expressly to facilities within the "[l]iquefied natural gas import and export equipment" industry segment. 42 U.S.C. § 7436(d)(7).

78.    Liquefied natural gas export equipment, in turn, "means all onshore or off-shore equipment that receives natural gas, liquefies natural gas, stores [liquefied natural gas], and transfers the [liquefied natural gas] via ocean transportation to any location, including locations in the United States." 40 C.F.R. § 98.230(a)(7).

79.    For these facilities, methane emissions are a necessary consequence of natural gas exportation, that is, they are "closely related to the export process" and so fall squarely within the scope of the Export Clause's protection. *IBM*, 517 U.S. at 846.

80.    Because the methane emissions generated at these facilities are generated during the course of the liquefied natural gas export process, the so-called "Waste Emissions Charge" is "in substance a tax on the exportation" of liquefied natural gas and "a tax on the exportation is a tax on the exports." *United States v. Hvoslef*, 237 U.S. 1, 17 (1915).

81.    It does not matter that the Methane Tax does "not facially discriminate against exports." *IBM*, 517 U.S. at 848. The Export Clause "prohibit[s] the application of" even "generally applicable, nondiscriminatory taxes" if the tax is, "in effect, a tax on exports." *Id.* at 848–49 (discussing *Hvoslef*, 237 U.S. 1, and *Thames & Mersey Marine Ins. Co. v. United States*, 237 U.S. 19 (1915)).

82.    Accordingly, to the extent that Section 136's "Waste Emissions Charge" applies to liquefied natural gas export facilities, it is "in effect" a tax on exports in violation of the Export Clause. *Id.* at 849.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief as follows:

1.    A declaratory judgment, pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, that Section 136 of the CAA violates the United States Constitution in all or any of the manners alleged above;

21

2.    Such other relief available under federal, state, and local law as this Court may deem just and proper, including attorneys' fees and costs of this action to the extent allowed by federal, state, or local law.

Dated: January 17, 2025

/s/ Michael Buschbacher
MICHAEL BUSCHBACHER
JAMES R. CONDE
BOYDEN GRAY PLLC
800 Connecticut Ave. NW,
    Suite 900
Washington, DC 20006
(202) 955-0620
mbuschbacher@boydengray.com

WILLIAM P. BARR
TORRIDON LAW PLLC
801 17th St., N.W.
Suite 1100
Washington, DC 20006
(202) 249-6900

*Counsel for Plaintiffs*