## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |
|---|---|
| AMERICAN FREE ENTERPRISE CHAMBEROF COMMERCE; and MICHIGAN OIL AND GAS ASSOCIATION,<br>        *Plaintiffs*,<br><br>  v.<br><br>LEE ZELDIN, in his official capacity as the Administrator of the United States Environmental Protection Agency; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; and UNITED STATES OF AMERICA,<br><br>        *Defendants*. | Case No. 1:25-cv-67 |

## BRIEF IN SUPPORT OF DEFENDANT-INTERVENORS' MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)

Plaintiffs challenge the constitutionality of an exemption provision in Section 136 of the Clean Air Act ("the Act")—which, among other things, establishes a Waste Emissions Charge ("Charge") on oil and gas facilities emitting large amounts of methane emissions. 42 U.S.C. § 7436—and allege harm from EPA's rule implementing the Charge ("the Rule") (ECF No. 1 at ¶ 48, 57, 68).

1

EPA finalized its implementation rule in November, 2024. 89 Fed. Reg. 91,046 (Nov. 18, 2024).[1]

On March 14, 2025, Congress passed, and the President signed, a Congressional Review Act resolution disapproving the Rule. H.J. Res. 35, 119th Cong. (2025). As a result, the Rule is "treated as though [it] had never taken effect;" moreover, the Rule "may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule." 5 U.S.C. §§ 801(b), (f).

The Complaint must be dismissed because Plaintiffs lack Article III standing. Not only is the exemption provision they attack as unconstitutional in Counts I and II not the source of their asserted injuries, but the exact opposite is true: nullifying the provision—which Plaintiffs ask the Court to do—*would* cause their asserted injuries. Plaintiffs also lack standing because they have not pleaded sufficient facts as to their Export Clause; because the Congressional Review Act resolution nullifying the Rule moots their suit and deprives them of any present

---

[1] On February 7, 2025, Defendant-Intervenors filed a proposed motion to dismiss and brief in support with their motion for leave to intervene. ECF No. 7-5 (motion), ECF No. 7-6 (brief in support). This brief and the motion submitted with it are intended to supersede those submissions.

injury, and because any ripe challenges that may arise in the future will be subject to exclusive D.C. Circuit adjudication.

## BACKGROUND

Methane is a potent greenhouse gas that is responsible for about one-third of all human-caused global warming and is thus a major driver of climate change. The oil and gas sector is the largest industrial source of methane emissions in the United States. Oil and gas facilities also emit large quantities of volatile organic compounds, which contribute to the formation of health-impairing ground-level ozone, as well as large quantities of hazardous air pollutants like benzene. *See* 89 Fed. Reg. at 91,156; 42 U.S.C. § 7412(b)(1) (listing these and other hazardous air pollutants).

In August 2022, Congress amended the Clean Air Act to establish a Charge on methane emissions from oil and gas facilities based on the commonsense principle that sources should be responsible for their excess pollution. 42 U.S.C. § 7436(c). Congress established the Charge to create an incentive for our nation's highest-emitting and least-efficient oil and gas operations to reduce their methane pollution. 89 Fed. Reg. at 91,096. The statute requires affected operators to pay a specified price for each metric ton of methane they emit above segment-specific thresholds. 42 U.S.C. § 7436(f). Operators with emissions below these thresholds are not required to pay the Charge. The statute directs EPA to collect the Charge

3

annually starting with 2024 emissions, *id.* § 7436(g), to allow for netting across commonly-owned sources when calculating liability, *id.* § 7436(f)(4), and to exempt sources in certain circumstances. Of particular relevance here, Congress created an exemption for facilities that are in compliance with EPA's Clean Air Act Section 111 standards for methane emissions for the oil and gas sector ("compliance exemption"). *Id.* § 7436(f)(6). However, this exemption only becomes available once EPA has made a "determination" that operators' compliance with final standards (including those for existing sources included in state plans) would achieve emissions reductions equivalent to or greater than EPA's proposed methane standards from November 2021. *Id.* § 7436(f)(6)(A)(ii). Section 136 also required EPA to update emission reporting requirements for sources in this sector and appropriated more than a billion dollars for various methane-reduction activities from oil and gas facilities. *Id.* §§ 7436(a), (h).

On November 18, 2024, EPA finalized the Rule. Among other things, the Rule explained how operators are to calculate Charge liability, submit payment, and claim exemptions in accord with details specified in the Act, 89 Fed. Reg. at 91,094-98, including the compliance exemption, *id.* 91,120-41, 91,185-90, 91,120-41, 91,185-90 (codified at 40 C.F.R. § 99.40 (2024)).

Between January 15 and 17, 2025, pursuant to the Act's judicial review provisions, 42 U.S.C. § 7607(b)(1), numerous parties filed petitions for review of

the Rule in the D.C. Circuit, which are now consolidated in that Court as *Independent Petroleum Ass'n of America, v. EPA*, D.C. Cir. No. 25-1021. Plaintiffs here are among those petitioners. *Am. Free Ent. Chamber of Commerce and Mich. Oil and Gas Ass'n v. EPA*, D.C. Cir. No. 25-1025 (filed Jan. 16, 2025).

In their Complaint, Plaintiffs challenge Section 136 as an unconstitutional delegation of Congress's legislative authorities because, they argue, the statute does not lay down an intelligible principle to guide EPA in implementing the Charge's compliance exemption. ECF No. 1 at ¶¶ 49-71. They also argue in Count III that the statute violates the Constitution's Export Clause. *Id.* ¶¶ 72-82.

On March 14, 2025, President Trump signed Congressional Review Act legislation that invalidates the Rule, including its procedures for implementing the Charge. Pub. Law No. 119-2; H.J. Res. 35, 119th Cong. (2025).

## STANDARDS FOR DECISION

On a facial attack on subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the court "takes the allegations in the complaint as true." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007); *see also United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 235-37 (1974)). "[W]here subject matter jurisdiction is challenged under Rule 12(b)(1), as it [is] here, the *plaintiff* has the burden of proving jurisdiction in order to survive the motion." *Rogers v. Stratton*

*Industries, Inc*., 798 F.2d 913, 915 (6th Cir. 1986) (emphasis in original). A

plaintiff bears the burden of establishing Article III standing and must allege facts

demonstrating each standing element. *Parsons v. U.S. Dept. of Justice*, 801 F.3d

701, 710 (6th Cir. 2015).

## ARGUMENT

## I.    PLAINTIFFS LACK ARTICLE III STANDING AS TO THEIR CHALLENGES TO THE REGULATORY COMPLIANCE EXEMPTION.

Article III standing is "a bedrock constitutional requirement" for litigation to

proceed in a federal court. *United States v. Texas*, 599 U.S. 670, 675 (2023).

> Standing consists of three elements: (1) an injury in fact that is (2) fairly traceable to the defendant's challenged conduct, and (3) likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Without the plaintiff suffering an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

*Burt v. Playtika, Ltd*., 132 F.4th 398, 403 (6th Cir. 2025). "[A] plaintiff must

demonstrate standing separately for each form of relief sought." *Friends of the

Earth, Inc.*, 528 U.S. at 185.

Counts I and II of the Complaint, in which Plaintiffs allege that the

compliance exemption violates a constitutionally mandated "unintelligibility

canon" and the nondelegation doctrine, fail to meet these standing requirements.

As to injury, the Complaint is vague about whether Plaintiffs' members would

have been subject to the Charge—which only applies to a subset of oil and gas operators—even with the Rule in effect, *see* ECF No. 1 at ¶ 7 (claiming that AmFree members will "suffer economic harm from Methane Tax liability under Section 136"); *id.* ¶ 8 (same for Michigan Oil and Gas Association members).

But assuming arguendo they have sufficiently alleged that some unspecified members would be subject to the Charge, Plaintiffs do not satisfy the causation or redressability elements of the Article III test. Their alleged injury stems entirely from the claim that some of their members will be obligated to pay the Charge, but do not at any point contest Congress's authority to enact the Charge, or assert that the Charge is otherwise constitutionally defective. Rather, Plaintiffs challenge a provision designed to *exempt* companies from having to pay the Charge in certain circumstances —the regulatory compliance exemption—as so incoherent that it violates the Constitution.

Plaintiffs thus have it backwards. Their assertion of standing reflects a claimed injury (the Charge) that is not traceable to the alleged illegality (the unconstitutional exemption). *See Rivas v. Rail Delivery Serv., Inc*., 423 F.3d 1079, 1083 (9th Cir. 2005) (plaintiff lacked Article III standing to challenge statutory provision where alleged injury was caused by different statutory provisions). On the contrary, the exemption serves as the primary offramp by which Plaintiffs' members could avoid the very injury they assert here.

Similarly, a judicial decree setting aside the regulatory compliance exemption would not redress Plaintiffs' injury, which derives from the statutory obligation to pay the Charge. After such a decree, the exemption would be gone, but Plaintiffs would still be subject to the Charge. *See Ctr. for Biological Diversity v. Exp.-Imp. Bank of the U.S.*, 894 F.3d 1005, 1013 (9th Cir. 2018) ("a claim still lacks redressability if the plaintiff will nonetheless suffer the claimed injury if a court rules in its favor"); *Texas v. EPA*, 726 F.3d 180, 198 (D.C. Cir. 2013) (no standing because vacating rules would not redress injury separately caused by a statute); *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1277 (D.C. Cir. 2007) (no redressability where "the undoing of the [challenged] governmental action will not undo the harm" caused by separate government action). Indeed, by removing a means of avoiding the Charge, a ruling by this Court striking down the regulatory compliance exemption would make parties subject to the Charge worse off.

Implicitly acknowledging the disconnect between their nondelegation claims and their claimed injury, Plaintiffs argue that the regulatory compliance exemption is not severable from the rest of the statute, and hence that the Charge should be struck down entirely. They argue that without the regulatory compliance exemption, Section 136 would be a "wholly different program," ECF No. 1 at ¶ 60,

and therefore the that the whole section is invalid if the exemption is
unconstitutional.

Even assuming that Plaintiffs can establish standing in this way, *cf.*
*California v. Texas,* 141 S. Ct. 2104, 2122 (2021) (declining to address viability of
"standing-through-inseverability" argument because issue was not properly
presented) (Thomas, J., concurring), their arguments still fail. Plaintiffs' position is
inconsistent with governing precedent on severability, and with Congress's
statutory design choices reflecting that the Charge should remain in place even if
the compliance exemption is not.

Where, as here, the statute does not contain a provision expressly addressing
the matter, the Court must adhere to the "strong presumption of severability,"
under which a court "presumes that an unconstitutional provision in a law is
severable from the remainder of the law or statute." *Barr v. Am. Ass'n of Political*
*Consultants, Inc.,* 591 U.S. 610, 623–26 (2020) (Kavanaugh, J.) (plurality
opinion); *see id.* at 648 (opinion of Breyer, J.). *See also Free Ent. Fund v. Public*
*Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010) ("normal rule" upon
finding a "constitutional flaw in a statute" is "to limit the solution to the problem,
severing any problematic portions while leaving the remainder intact.") (cleaned
up).

That presumption applies here and accords with a common-sense reading of the statute. The statutory text nowhere indicates that the Charge depends upon the compliance exemption; instead, the Charge and the exemption are separate, and operate independently, from one another. Indeed, Congress specified that the Charge should go into effect in 2024, 42 U.S.C. § 7436(g)—years before the state plans that could serve to make the exemption available would even be due to EPA for review and potential approval, let alone be implemented in practice. 40 C.F.R. § 60.5362c (state plans due to EPA by March 9, 2026).

Moreover, the real possibility that the compliance exemption could remain unavailable is evident in that the statute makes the exemption contingent upon a finding from EPA both that standards and plans "have been approved and are in effect in all States with respect to the applicable facilities," and that the plans meet the specified equivalency requirement. 42 U.S.C. § 7436(f)(6)(A). Congress clearly contemplated the scenario where the Charge would be effective even when the exemption would not be. The independence of the Charge is also evident in the requirement that the Charge once again take effect if the conditions authorizing the regulatory compliance exemption cease to exist. *Id.* § 7436(f)(6)(B). It is implausible that a Congress intent on creating strong incentives to reduce emissions would have wanted the program to fall entirely because of a flaw in an exemption.

Accordingly, Plaintiffs' efforts to manufacture standing fail. *See Midwest Media Prop., L.L.C. v. Symmes Twp.*, 503 F.3d 456, 465 (6th Cir. 2007) ("Because the size and height requirements are severable from the allegedly unconstitutional provisions and because they prohibited plaintiffs from obtaining relief on their damages and injunction claims, the district court properly relied on those provisions in concluding that plaintiffs lacked standing to bring this lawsuit."). Counts I and II must be dismissed.

## II.    PLAINTIFFS HAVE NOT PLEADED FACTS SUFFICIENT TO SUPPORT THEIR ARTICLE III STANDING TO PURSUE AN EXPORT CLAUSE CLAIM.

Count III asserts that Section 136 violates the Constitution's Export Clause, but Plaintiffs' Complaint contains no allegations to support an export-related injury. *See* Compl. ¶¶ 72-82. The Complaint describes purported impacts on import and export facilities for liquified natural gas, but does not indicate that Plaintiffs or their members own or operate any such facilities. *See* Compl. ¶¶ 7-8 (describing Plaintiffs). The Court should therefore also dismiss this claim for lack of standing. *See Bearden v. Ballad Health*, 967 F.3d 513, 517 (6th Cir. 2020) (citing *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 339 (2016)); *see also Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 842 (6th Cir. 2024). The requisite standing demonstration must be made "for each claim." *Oklahoma v. United States*, 62 F.4th 221, 233 (6th Cir. 2023).

Standing requires that Plaintiffs show an injury-in-fact from the challenged action. *Lujan*, 504 U.S. at 560. Yet Plaintiffs' Complaint contains no facts to establish an export-related injury. Since "standing is not dispensed in gross," *TransUnion, LLC, v. Ramirez*, 594 U.S. 413, 431 (2021), Plaintiffs have made no showing of export-related injuries, Count III should be dismissed.

## III.    PLAINTIFFS' CLAIMS ARE NONJUSTICIABLE FOR OTHER REASONS AS WELL.

The Congressional Review Act ("CRA") legislation invalidating the Rule means that those implementing regulations under 42 U.S.C. § 7436(c) have no further effect. Since the statute expressly gives EPA the responsibility to "impose and collect" the Charge, these developments mean that EPA will need to take further action to implement the statute, and, specifically, that EPA will need to explain how it will implement the regulatory compliance exemption. Because of the CRA disapproval, any new implementing regulations cannot be "substantially the same" as the prior regulations absent new legislation. Plaintiffs allege harm from application of the Rule, *supra* p. 1-2, and extensively cite the Rule in support of their constitutional claims. *See* Complaint, ¶¶ 45-48, 54, 57.  But because the Rule has been nullified by Congress, that makes it "impossible for the court to grant relief" based on facts and legal arguments in the complaint. *Davis v. Colerain Twp.*, 51 F.4th 164, 174 (6th Cir. 2022).

Thus, to the extent Plaintiffs have challenged the statute as implemented in the Rule, their claims are moot.[2]

In light of the CRA action, any current injury to Plaintiffs is speculative and uncertain. Plaintiffs may pursue their constitutional claims again once EPA provides for the exemption. But any challenge is unripe at this junction.

## IV.    ANY JUSTICIABLE CLAIMS PLAINTIFFS BRING WILL BE SUBJECT TO EXCLUSIVE REVIEW IN THE D.C. CIRCUIT.

If and when Plaintiffs can allege claims that are justiciable, they may pursue them only in the United States Court of Appeals for the D.C. Circuit.

As EPA recognized in the Rule, its regulations facilitating the Charge are "'nationally applicable' within the meaning of [Clean Air Act] section 307(b)(1)." 89 Fed. Reg. at 91,162. Those regulations are, accordingly, subject to judicial review only in the D.C. Circuit. Plaintiffs themselves, as well as numerous other petitioners, recognized as much; Plaintiffs are among the petitioners for review in the still pending (but likely moot) litigation in that Court. *American Free*

---

[2] The fact that it was Congress, through formal legislation under the CRA, that rescinded the regulation means that the rigorous mootness test for "voluntary cessation" by the defendant should not apply. *See Maras v. Mayfield City School District Board of Education*, 2024 WL 449353, at *4 (6th Cir. 2024) (unpublished); *Thompson v. Michigan*, 2022 WL 168395, at *3 (W.D. Mich. 2022) (case mooted by government's rescission of order because rescission was in response to state supreme court opinion finding the order invalid).

*Enterprise Chamber of Commerce and Michigan Oil and Gas Association v. EPA*,

D.C. Cir. No. 25-1025 (filed Jan. 16, 2025); *see* ECF No. 1 at ¶ 46.

The Clean Air Act's exclusive jurisdictional regime is unambiguous. Section

307(b)(1) of the Clean Air Act provides that:

> A petition for review of action of … any … nationally applicable
> regulation[] promulgated, or final action taken, by
> the Administrator under this chapter may be filed only in the
> United States Court of Appeals for the District of Columbia.

42 U.S.C. § 7607(b)(1). The exclusive nature of this provision is explicit in the

word "only." *See Anaconda Co. v. Ruckelshaus,* 482 F.2d 1301, 1304 (10th Cir.

1973) ("The intent of Congress to make the court of appeals the exclusive forum is

apparent from that wording."). Section 307(b)'s provision directing challenges to

actions under the Clean Air Act straight to the court of appeals is "jurisdictional."

*Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 591 (1980). "Where a statute vests

jurisdiction in a particular court, such exclusive jurisdiction precludes the exercise

of original jurisdiction in other courts in all cases covered by that statute." *Greater*

*Detroit Res. Recovery Auth. v. EPA*, 916 F.2d 317, 322 (6th Cir. 1990).

Exclusive court of appeals review serves critical Congressional policies. As

the Sixth Circuit explained nearly 50 years ago, "[b]y centralizing appeals in the

District of Columbia Circuit Court within a limited time period, Congress hoped to

avoid needless delays in the implementation of important national programs caused

by incessant litigation and inconsistent decisions." *Lubrizol Corp. v. Train*, 547

F.2d 310, 315 (6th Cir. 1976). Section 307(b)(1) allows for "'even and consistent national application'" of the Clean Air Act, *id.* at 315 (quoting S. Rep. No. 91-1196, 91st Cong., 2d Sess., at 441 (1970)), thereby "ensur[ing] uniformity in decisions concerning issues of more than purely local or regional impact." *Id.* at 315 (quoting *Nat. Res. Def. Council v. EPA*, 512 F.2d 1351, 1356 (1975)).

Plaintiffs' own behavior belies any argument that constitutional challenges here are separable from judicial review of EPA's implementation of the statute: despite the fact that Section 136 became law in August 2022, they took no action to challenge its constitutionality for nearly two-and-a-half years, only filing their lawsuit after EPA issued the Rule and the day after they submitted their petition for review of that Rule in the D.C. Circuit.

Settled precedent bars such circumvention of the Clean Air Act's judicial review provisions. Plaintiffs' claims are "of the type Congress intended to be reviewed within [a] statutory structure." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994)). In special statutory review frameworks like Clean Air Act Section 307's, the court of appeals "effectively fills in for the district court, with the court of appeals providing judicial review" only following an administrative action. *Axon*, 598 U.S. at 185; *Thunder Basin*, 510 U.S. at 208-09.

15

The Supreme Court's cases identify three considerations that determine whether district court litigation is precluded: "First, could precluding district court jurisdiction foreclose all meaningful judicial review of the claim? Next, is the claim wholly collateral to the statute's review provisions? And last, is the claim outside the agency's expertise?" *Axon*, 598 U.S. at 186 (cleaned up); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489-91 (2010); *Elgin v. Dep't of Treasury*, 567 U.S. 1, 15-23 (2012); *Thunder Basin*, 510 U.S. at 212-16; *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 605-07 (6th Cir. 2024); *Hill v. SEC*, 825 F.3d 1236, 1241, 1245 (11th Cir. 2016) (noting that *Thunder Basin* analysis "focuses on whether the litigant's claims will receive meaningful judicial review within the statutory structure," and that the first factor is the "most critical thread in the case law").

Applying this test, Courts have refused to allow plaintiffs to circumvent Congress's carefully wrought provisions for Clean Air Act implementation in Section 307(b)(1) by seeking to bring constitutional challenges in district court. *See Missouri v. United States*, 109 F.3d 440, 441-42 (8th Cir. 1997); *Virginia v. United States*, 74 F.3d 517, 522-23 (4th Cir. 1996); *see also RMS of Ga., LLC v. EPA*, No. 23-cv-4516, 2024 WL 5096505, at *3-4 (N.D. Ga. Sept. 3, 2024).

The same result is required here. The first and "most critical" factor forcefully cuts against district court jurisdiction in this case. Requiring Plaintiffs to

pursue their claims in the D.C. Circuit would in no way "foreclose all meaningful judicial review," *Axon*, 598 U.S. at 186, since theoretically (should the case dispute despite the CRA legislation) that court could readily review those claims in the case that Plaintiffs have already initiated in that venue. The Clean Air Act's review provision expressly authorizes courts to hear claims that the agency's action is "contrary to constitutional right, power, privilege, or immunity." 42 U.S.C. § 7607(d)(9)(B).

Nor is there anything about the particular constitutional claims Plaintiffs assert that would preclude their adjudication in the D.C. Circuit. There is "no question," for example "that a nondelegation doctrine challenge can be raised in a [Clean Air Act] § 307 proceeding." *RMS of Ga.*, 2024 WL 5096505, at *4. Indeed, as the *RMS* court noted, *id.*, the landmark nondelegation decision Plaintiffs cite arose out of a D.C. Circuit Section 307(b) petition for review, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 463, 472-76 (2001) (cited in ECF No. 1 at ¶¶ 50, 69), *reversing Am. Trucking Ass'ns v. EPA*, 175 F.3d 1027, 1033 (D.C. Cir. 1999) (holding that EPA air quality rule violated nondelegation doctrine). *See also Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*, 71 F.4th 59, 64-65 (D.C. Cir. 2023) (ruling that nondelegation argument is subject to statutory Clean Air Act exhaustion requirement). Plaintiffs similarly can raise their

nondelegation claims in the court of appeals proceedings under Clean Air Act Section 307(b)(1).

Second, far from being "wholly collateral to [the Clean Air Act]'s review provisions," *Axon*, 598 U.S. at 186, Plaintiffs' claims are interwoven with EPA's administration of Section 136—and therefore with the Act's special procedure for judicial review. Plaintiffs' nondelegation claim asserts that the Act fails to provide EPA with an intelligible principle for addressing whether sources are subject to Section 136's regulatory compliance exemption. That issue is based in part on EPA's determination of equivalency between the final methane emission standards and plans to which oil and gas operators are subject under Section 111 of the Act (on the one hand) and (on the other) the emission reductions that would have occurred under the agency's proposed set of methane standards from November 2021. Indeed, Plaintiffs directly reference the Rule as supporting their nondelegation claim, ECF No.1 at ¶ 54, (incorrectly) suggesting that the Rule shows that EPA has already agreed that it cannot possibly make the equivalency determination.

Evaluating Plaintiffs' "unintelligibility canon" and nondelegation claim requires more than a facial analysis of the statute, but will necessarily require the court to consider EPA's efforts to implement the statute in practice. For example, the 2024 Rule explained that EPA would evaluate the "quantity of emissions

reductions" from the November 2021 Methane Proposal to those that are ultimately achieved under the applicable standards, and that it will compare final Section 111 state plans "against a baseline in which the proposed standards were finalized as drafted [in 2021] and *implemented in each State.*" 89 Fed. Reg. at 91,128 (emphasis added).  Whatever post-CRA action EPA takes to implement the statute, its action will necessarily be an "action . . . of nationwide scope or effect" reviewable only in the D.C. Circuit, including as to constitutional claims. 42 U.S.C. § 7607(b)(1).

Furthermore, Plaintiffs themselves "trace[] [their] injuries to [] regulatory actions by the EPA." *RMS of Georgia*, 2024 WL 5096505, at *4; *see* ECF No. 1 at ¶ 57 (alleging harm directly from the Rule, its requirement that payments be submitted by September 2025, and its sanctions); *see also id.* ¶¶ 48, 68. Plaintiffs' public comments during EPA's administrative proceedings to develop the Rule demonstrate that EPA's ability to make the equivalency determination depends not on Section 136 on its face, but on the agency's specific policy choices in the implementation process. In their comments, Plaintiffs asserted that "EPA *can and should* make the equivalency determination *now*, based on a comparison between the emissions reductions projected in its November 2021 proposal and those in its

19

March 2024 final rule." AmFree Comments at 18 (emphasis added).[3] Plaintiffs also submitted that EPA could "avoid" nondelegation problems by making certain changes to the Rule as proposed. *Id.* These and other comments collected in the administrative record for the Rule are the type of "evidence that would be relevant to constitutional review in the courts of appeals." *See Virginia*, 74 F.3d at 525 n.5.

Finally, Plaintiffs' Complaint expressly challenges EPA's enforcement of the Rule, ECF No. 1 at ¶ 52, and asks the Court to enjoin EPA from implementing it, *id*. at ¶ 4. Here, as in *Missouri*, "[t]here is simply no reason the constitutional challenges of this lawsuit should be, or even can be, separated from a challenge to final EPA action under the [Clean Air Act]." 109 F.3d at 442.

Plaintiffs' Export Clause claim is similarly interwoven with the Rule (and will be interwoven with any new implementing actions that EPA may undertake in the future). Plaintiffs assert that "to the extent that Section 136's 'Waste Emissions Charge' applies to liquefied natural gas export facilities," it is a "tax on exports [of liquefied natural gas] in violation of the Export Clause." ECF No. 1 at ¶ 82. But to support their claim, Plaintiffs cite only the definition of "[l]iquified natural gas [import and] export equipment" contained in 40 C.F.R. § 98.230. ECF No. 1 at ¶ 78. And it is in the Rule that, after weighing public comments urging otherwise,

---

[3] *Available at* https://www.regulations.gov/comment/EPA-HQ-OAR-2023-0434-0283.

the agency interpreted Section 136 to incorporate the definition at Section 98.230.
*See* 89 Fed. Reg. at 91,101. As with the nondelegation claims, this constitutional
challenge belongs in the exclusive D.C. Circuit forum.

Finally, Plaintiffs' claims are not outside EPA's expertise; precisely the
opposite, in fact. In *Thunder Basin* itself, the Court explained that a claim
"requir[ing] interpretation" of a statute "f[e]ll squarely within the … expertise" of
an agency charged with implementing a statute. 510 U.S. at 214; *see also Gundy v.
United States,* 588 U.S. 128, 135 (2019) ("[A] nondelegation inquiry always begins
(and often almost ends) with statutory interpretation."). Plaintiffs' claims that
Section 136 provides inadequate direction with regard to a calculation of relative
emission reductions expected under proposed and final Clean Air Act methane
requirements implicate technical matters that are squarely within the agency's
expertise. Unlike a procedural claim, this calculation involves "technical
considerations of agency policy," and EPA "knows a good deal about [pollution-
control] policy." *See Tennessee*, 104 F.4th at 607 (quotations and citations omitted).

As noted above, at the rulemaking stage, Plaintiffs themselves urged that
EPA interpret the statute to accommodate their concerns. And the relationship
between the nondelegation doctrine and the agency's implementation of the
relevant statutory provisions was similarly evident in *American Trucking*, in which
the Supreme Court relied heavily upon EPA's interpretation of the statute (as

described by the Solicitor General) in reviewing—and rejecting—the challengers'

nondelegation argument. 531 U.S. at 473 (reviewing and "agree[ing] with" the

agency's interpretation of the statute and holding that it posed no nondelegation

problem). EPA's statutory analysis of a recently enacted statute aids the court in

resolving Plaintiffs' nondelegation claim and thus "alleviate[s] constitutional

concerns." *Elgin*, 567 U.S. at 23.

There is no reason to believe Congress would have wanted challenges like

Plaintiffs' to be brought anywhere but the D.C. Circuit, which, as noted above, has

express authority to decide constitutional questions in the petition for review

process, together with other claims that might implicate EPA's analysis. To the

contrary, allowing parallel challenges in district or other appellate courts "would

present a grave risk of inconsistent results and encourage forum shopping"—

"precisely what Congress hoped to avoid." *Lubrizol*, 547 F.2d at 317.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Complaint should be dismissed.

Respectfully submitted,

/s/ Wendy Bloom
Wendy Bloom
Environmental Law & Policy Center
35 East Wacker Drive
Suite 1600
Chicago, IL 6061
(312) 673-6500
WBloom@elpc.org

Counsel for Environmental Law &
Policy Center

/s/ Andres Restrepo
Andres Restrepo
Sierra Club
50 F St., NW, Eighth Floor
Washington, DC 20001
(856) 240-0964
Andres.Restrepo@sierraclub.org

Counsel for Sierra Club

/s/ Ann Brewster Weeks
Ann Brewster Weeks
Darin Schroeder
Mary Y. Sasso
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
(617) 624-0234
aweeks@catf.us

Counsel for Earthworks

/s/ Sean H. Donahue
Sean H. Donahue
Donahue, Goldberg & Herzog
1008 Pennsylvania Ave., SE
Washington, D.C. 20003
(202) 277-7085
sean@donahuegoldberg.com

Counsel for Environmental Defense
Fund and Center for Biological
Diversity

Grace Smith
Edwin LaMair
Rosalie Winn
Environmental Defense Fund
2060 Broadway, Ste. 300
Boulder, CO 80302
(303) 447-7212

Margaret A. Coulter
Jason C. Rylander
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
(202) 961-4820

**CERTIFICATE OF COMPLIANCE**

I hereby certify that, according to the word-count function of Microsoft Word, the foregoing brief contains 4883 words.

Date: April 30, 2025                     */s/ Sean H. Donahue*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing brief was filed via the Court's ECF system, which will provide copies to all registered counsel of record.

Date: April 30, 2025                     */s/ Sean H. Donahue*